UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ROBERT A. GREATHOUSE**,  Case Number 5:12 CV 2425

    Plaintiff,  Judge Lesley Wells

    v.  REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.  Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Robert A. Greathouse filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income (SSI) and disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated September 27, 2012). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on April 17, 2008, alleging a disability onset date of January 2, 2007, due to neck and back problems, difficulty reading and writing, and mental problems. (Tr. 74-75, 144, 161, 173-74). His claims were denied initially and on reconsideration. (Tr. 74-81, 84-90). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 7). He was 47 years old at the ALJ hearing held November 17, 2010. (Tr. 30-71). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ

found Plaintiff not disabled. (*See* Tr. 8, 30). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On June 1, 2012, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

Personal and Vocational History

Plaintiff failed to complete grade school, having stopped attending in either the fifth (Tr. 37), sixth (Tr. 149), or seventh grade (Tr. 274). In his brief, Plaintiff alleged he was primarily unable to work because of his low I.Q. (Doc. 14, at 2). Plaintiff generally described this limitation as difficulty reading and writing. (Tr. 144-45). However, at the hearing and in disability reports, Plaintiff alleged his main limitation was his back and neck problems. (*See* Tr. 44, 145, 165, 173-74). At the hearing, the ALJ asked Plaintiff, "tell me what it is that you think stops you from being able to work?" (Tr. 44). Plaintiff responded, "I got severe neck pain all the time, always unbearable. . . . The biggest issue though, is my back, because I can't . . . bend over". (Tr. 45).

Plaintiff last worked in 2005. (Tr. 143). At the hearing, the VE classified Plaintiff's past relevant work as construction worker, trash collector, car detailer, and scrap baler. (Tr. 63-65, 151). A significant majority of Plaintiff's work history included baling scrap in a scrap yard or hauling scrap metal. (Tr. 151). Concerning the latter, Plaintiff drove and operated a truck with a back-loader. (Tr. 154). Plaintiff said he had serious problems with his back when lifting heavy metal objects on these jobs but made no mention of mental or cognitive issues. (Tr. 154-55). At the time of the hearing, Plaintiff had a valid drivers license and said he could read some street signs, but had obtained his license by taking an oral driving test. (Tr. 36).

Plaintiff testified he had been "in prison [] almost [twenty] years of [his] life." (Tr. 45). Indeed, Plaintiff served nearly twenty years in prison for various offenses including gross sexual

imposition, felonious assault, domestic violence, and driving under the influence. (Tr. 45, 274, 275, 412-13). Plaintiff's anger management issues, history of violent behavior, and substance use are evidenced throughout the record. (Tr. 274, 337, 342, 372, 387, 399, 412-13, 448-49, 529). He was convicted of felonious assault for stabbing a man during a fight in 1990; at the age of sixteen he was shot in the neck during an argument with another male; he was convicted of domestic violence for assaulting his sister-in-law and two young nephews; and he was involved in various altercations while in prison. (Tr. 274, 337, 342). Plaintiff also has a history of cocaine, marijuana, and alcohol abuse, and had two DUI convictions. (Tr. 275, 466, 448). In 2009, he was consuming one-to-two cases of beer a day (Tr. 466), but at the hearing he indicated he only had "a couple of beers here and there[,]once and awhile" (Tr. 37).

After being released from prison in 2007 (Tr. 150), Plaintiff lived with family and friends in Ohio (Tr. 172). Plaintiff later moved to Florida to live with his step-father. (Tr. 35). Plaintiff had a daughter and three grandchildren who occasionally visited him. (Tr. 40). He said he enjoyed watching movies and television and was very good at fixing things and assembling model cars and planes. (Tr. 39, 176, 211). Concerning daily activity, Plaintiff was able to prepare simple meals, use public transportation, drive, shop in stores, attend church services, act as an usher at church services, and attend AA/NA meetings. (Tr. 39-40, 174-75, 194, 211-12, 214-15).

Evidence of Plaintiff's Mental Functioning and Intelligence Testing

Plaintiff underwent intelligence testing as a child and an adult. School records from 1972 showed Plaintiff had intelligence testing on two occasions, "each of which [had] given him an I.Q. of approximately 80." (Tr. 235). Dr. Burdette indicated Plaintiff had progressed normally with respect to speaking, walking, riding a bicycle, and learning to tie his shoes. (Tr. 235). He also noted

Plaintiff was hyperactive, distractable, inappropriate, and had "limited intellectual capacity." (Tr. 235-36).

In October 1972, Dr. Corbitt evaluated Plaintiff's intelligence by testing him with the Wechsler Intelligence Scale for Children (WISC). (Tr. 238). During the examination, Plaintiff was "uncomfortable, [] complain[ed] about being sleepy[,] and [said] his eyes bother[ed] him." (Tr. 238). The WISC revealed Plaintiff had a verbal I.Q. of 75, performance I.Q. of 67, and a full scale I.Q. of 69. (Tr. 240). However, Dr. Corbitt noted these results were "somewhat depressed because of [Plaintiff's] physical discomfort on account of his allergies, his distractibility[,] and short attention span." (Tr. 240). Dr. Corbitt concluded Plaintiff should be placed in "slow learning" classes. (Tr. 240).

Plaintiff also underwent psychological testing while in prison in 1998. (Tr. 252). Dr. Russo found Plaintiff had good concentration, intact memory, coherent speech, and estimated Plaintiff's intelligence was average-to-lower-average. (Tr. 252). Testing revealed Plaintiff had an I.Q. of 93. (Tr. 256-71).

Dr. David Ellis, a psychologist at Madison Correctional Institution, also assessed Plaintiff's intellectual functioning in 1998. (Tr. 274-75). Dr. Ellis noted intelligence testing revealed "average intellectual functioning" but that Plaintiff was a non-reader. (Tr. 275). On examination, Plaintiff made good eye contact, had intact memory, fair insight and judgment, coherent speech, and a calm, passive demeanor. (Tr. 275). Dr. Ellis noted Plaintiff had "temper control issues", was "aggressive and compulsive", and had polysubstance abuse problems. (Tr. 275). Despite Plaintiff's illiteracy, Dr. Ellis found Plaintiff had "average intelligence". (Tr. 275).

In 2002, Plaintiff underwent mental health testing at Lorain County Correctional Institution.

(Tr. 357-364). On examination, Plaintiff said he could not read or write. (Tr. 358). He was able to comprehend and complete General Ability Measure for Adults (GAMA) testing and received a GAMA I.Q. score of 80. (Tr. 357). This score indicated Plaintiff had intellectual functioning in the low-to-below average range. (Tr. 364).

On December 11, 2007, Dr. Dallara performed a psychological evaluation. (Tr. 399-404). Plaintiff reported he would have difficulty "working because he ha[d] problems with his hip, back, and neck." (Tr. 399). Plaintiff was generally cooperative, made adequate eye contact, and had intelligible speech despite occasional mumbling. (Tr. 400). His thinking was logical but somewhat superficial. (Tr. 400). He was alert and oriented to time, place, person, and situation, and was able to count backward from twenty and say the alphabet correctly. (Tr. 400). Dr. Dallara concluded Plaintiff's insight and judgment were moderately impaired. (Tr. 401). Meaning Plaintiff would have some difficultly living independently, making important decisions about his future, and managing his own funds. (Tr. 401).

Dr. Dallara administered the Wechsler Adult Intelligence Scale test (WAIS-III). (Tr. 401). Plaintiff obtained a verbal I.Q. score of 69, performance I.Q. score of 76, and full scale I.Q. score of 70. (Tr. 401). Dr. Dallara noted Plaintiff "generally appeared to attempt to be cooperative, although on occasion he may have resigned easily." (Tr. 401). Dr. Dallara found Plaintiff's WAIS-III scores indicated he was functioning in the borderline range of intelligence. (Tr. 402). He diagnosed Plaintiff with attention deficit/hyperactivity disorder, learning disorder, borderline intellectual functioning, and personality disorder. (Tr. 402). Moreover, he assigned Plaintiff a global

5

assessment of functioning (GAF) score of 55.[1] (Tr. 402). Dr. Dallara specifically found Plaintiff was only mildly impaired in his abilities to relate to others, understand, remember, and follow instructions, and withstand stress and pressure associated with day-to-day work activity. (Tr. 402).

Dr. Leidal gave Plaintiff a psychological evaluation on June 22, 2008. (Tr. 411). Plaintiff was clearly alert and oriented to person, place, time, and situation. (Tr. 413). His thought content was generally normal and there was no evidence of grossly disorganized behavior or marked confusion. (Tr. 413). Plaintiff's ability to understand and comprehend simple language was fair but his ability to understand more complex instructions was poor. (Tr. 413). Concerning cognitive functioning, Plaintiff was not markedly distracted or impaired when answering questions. (Tr. 414). "Intelligence, based on mental status, was estimated to be deficient to borderline, at best." (Tr. 414). His judgment and insight were poor. (Tr. 414).

Plaintiff was diagnosed with dysthymic disorder, alcohol abuse, intermittent explosive disorder, adult anti-social behaviors, borderline intellectual functioning, and personality disorder. (Tr. 415). He was assigned a GAF score of 55. (Tr. 415). Dr. Leidal concluded Plaintiff was moderately impaired in his abilities to relate to others, maintain concentration, and complete daily tasks. (Tr. 415-16). Plaintiff's ability to follow short, simple instructions was not impaired. (Tr. 416).

State Agency Reviewers

On June 22, 2008, Douglas Pawlarczyck, Ph.D., reviewed Plaintiff's medical records and

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

assessed his mental ability to function. (Tr. 419-36). He found Plaintiff had the capacity for simple, routine work. (Tr. 421). On September 27, 2008, Aracelis Rivera, Psy.D., reviewed all the evidence and affirmed Dr. Pawlarczyck's assessment. (Tr. 462).

On July 7, 2008, Maria Congbalay M.D. assessed Plaintiff's physical capacity and found he could perform work at the medium level of exertion. (Tr. 437-44). Plaintiff could lift and/or carry up to 50 pounds occasionally, 25 pounds frequently, and stand and/or walk six hours in an eight-hour workday. (Tr. 438). She assigned no postural, manipulative, or environmental limitations. (Tr. 439-40).

Evidence Related to Physical Impairments

Plaintiff was shot in the neck when he was sixteen years old and the bullet was never removed. (Tr. 392, 448, 455). Plaintiff complained of tenderness in his neck and problems with his lumbar spine. (Tr. 393, 548, 674, 687, 701). X-rays taken in June and November of 2009 revealed multi-level degenerative disc disease but less than grade 1 spondylolisthesis. (Tr. 504, 552). There was a moderate degree of diffuse disc bulging into each foramen with a mass effect on the exiting nerves. (Tr. 504, 552). However, "[n]o significant degenerative disc disease [was] noted." (Tr. 503). Plaintiff also complained of hip pain, but objective reports showed only degenerative changes with well-maintained joint spaces. (Tr. 457).

On October 18, 2007, Dr. Cantor examined Plaintiff and assessed his physical capacity. (Tr. 393-94). He found Plaintiff could ambulate normally but had pain in his neck and back. (Tr. 393-94). He diagnosed Plaintiff with remote gunshot wound to the neck and lumbosacral strain with degenerative disc disease. (Tr. 393). Dr. Cantor concluded Plaintiff would have difficulty with heavy, physical work or any work requiring prolonged standing, walking, climbing, squatting, or

7

crawling. (Tr. 394).

On June 5, 2008, Chimezie Amanambu, M.D. examined Plaintiff and assessed his physical capacity. (Tr. 405-06). On examination, Plaintiff's back appeared normal, there was no tenderness to the spinal process or paraspinal muscles, and straight leg raising was negative in the sitting and lying positions. (Tr. 406). His joints and muscles were normal, evidenced by lack of swelling, tenderness, wasting, or fasciculation. (Tr. 406). Concerning his neck, there were no radicular signs or symptoms. (Tr. 406). Dr. Amanambu concluded Plaintiff could engage in moderate work activities but Plaintiff would have difficulty with prolonged sitting, standing, walking, bending, or twisting. (Tr. 406). He found Plaintiff's neck pain would not affect his ability to work. (Tr. 406).

ALJ Decision

On June 28, 2011, the ALJ found Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, degenerative joint disease of the right shoulder, remote gunshot wound to the neck, hypertension, learning disability, dysthymic disorder, and polysubstance abuse. (Tr. 13). The ALJ found these impairments did not meet or medically equal a listed impairment. The ALJ then determined Plaintiff had the residual functional capacity (RFC) to perform sedentary work with postural, environmental, and mental limitations, which included only simple, routine tasks with simple, short instructions; simple work-related decisions; few work place changes; no production rate pace activities; and no math calculations, reading of instructions, or writing reports. (Tr. 16). Based on VE testimony, the ALJ found Plaintiff could perform jobs in the national and local economies, including bench assembler, wire worker, and final assembler. (Tr. 21-22).

At step three, the ALJ determined Plaintiff did not meet listing 12.05, intellectual disability. (Tr. 14-16). The ALJ found Plaintiff did not meet this listing because the evidence failed to

8

demonstrate deficits in adaptive functioning before twenty-two years of age, he did not have a valid I.Q. score of 60 through 70, and he had only mild restrictions concerning activities of daily living, and moderate difficulty with social functioning, concentration, persistence, and pace. (Tr. 14-16). The ALJ focused on Dr. Dallara's testing, which indicated Plaintiff had a full scale I.Q. score of 70. (Tr. 16). However, the ALJ discounted Dr. Dallara's scores because Dr. Dallara did not state they were valid and Plaintiff had "resigned easily" during testing. (Tr. 16). The ALJ also pointed to school records from 1972 indicating Plaintiff had an I.Q. of 80. (Tr. 16).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); §

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred by finding he did not meet listing impairment 12.05(C) – intellectual disability. Plaintiff also argues the ALJ's RFC finding was not supported by substantial evidence.

**Listing 12.05(C)**

A claimant can demonstrate he is disabled by presenting "medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). The diagnostic description of intellectual disability of 12.05 refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, § 12.05.

To demonstrate intellectual disability, formerly termed mental retardation, a claimant must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in Listing 12.05. *See Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05(C) requires that a claimant have a valid, verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

Here, the ALJ found Plaintiff did not have a valid, verbal, performance, or full scale I.Q. score of 60 through 70. (Tr. 14-16). The record showed Plaintiff had multiple intelligence testing

11

both as an adult and a child but only two sets revealed low intelligence testing scores. (Tr. 240, 401). Notably, both came with qualifying statements which undermined their validity. Moreover, these low scores conflicted with numerous test scores Plaintiff received above the qualifying level. (Tr. 235, 256, 275).

With respect to testing in October 1972, Plaintiff received a verbal I.Q. score of 75, performance I.Q. of 67, and a full scale I.Q. of 69. (Tr. 240). Not only are these scores on the high range, test administrator Dr. Corbitt noted these results were "somewhat depressed because of [Plaintiff's] physical discomfort on account of his allergies, distractibility[,] and short attention span." (Tr. 240).

The other set of low I.Q. scores indicated Plaintiff had a verbal I.Q. of 69, a performance I.Q. of 76, and a full scale I.Q. of 70. (Tr. 401). The ALJ correctly noted Dr. Dallara did not state whether these I.Q. scores were valid, and while Plaintiff appeared to cooperate, Dr. Dallara noted he resigned easily during testing. (Tr. 401). Moreover, Dr. Dallara found Plaintiff functioned at the borderline intellectual level, not the mentally retarded level. (Tr. 402). Additionally, despite his impairments, Dr. Dallara specifically found Plaintiff was only mildly impaired in his abilities to relate to others, understand, remember and follow instructions, maintain concentration and attention, and withstand stress and pressure associated with day-to-day work activity. (Tr. 402).

Other testing in the record showed Plaintiff had an I.Q. much higher than the aforementioned conditioned scores. In 1972, school records indicated Plaintiff had intelligence testing on two occasions, each of which showed he had I.Q. of approximately 80. (Tr. 235). Further, testing in 1998 and 2002 revealed he had an I.Q. of 93 and 80, respectively. (Tr. 256-71, 357); *See Kraushaar v. Comm'r of Soc. Sec.*, 2012 WL 6953381, at *13-14 (N.D. Ohio 2012), *affirmed and adopted*, 2013

WL 331121 (N.D. Ohio 2013) (While a claimant had some qualifying numerical test scores for a listing impairment, a majority of scores showing she tested above the required threshold disqualified her).

Plaintiff cites *Killings v. Comm'r of Soc. Sec.*, 2012 WL 5414953 (N.D. Ohio 2012) to argue the ALJ erred because she failed to cite any evidence as to why Dr. Dallara's observational remarks made the score invalid. (Doc. 16, at 3). The plaintiff in *Killings* was administered only one I.Q. test, which revealed a full scale I.Q. score of 67 and verbal comprehension score of 66. 2012 WL 5414953, at *10. The ALJ found the plaintiff's I.Q. score of 67 was not valid because the psychologist said the score was a "minimal estimate of intellectual functioning because he seemed to be tentative, hesitant, and lacking confidence in himself and his abilities." *Id*. The court in *Killings* remanded because it was unclear which score was considered the minimal estimate, the full scale score of 67 or the verbal score of 66. *Id*. at *11. In turn, this rendered the ALJ's decision unclear.

*Killings* is not applicable. Here, the ALJ found Plaintiff's I.Q. score was invalid because Plaintiff resigned easily during testing and other I.Q. scores in the record indicated he maintained a higher level of intelligence than required by listing 12.05(C). Unlike *Killings*, additional I.Q. test scores existed showing Plaintiff exceeded the 12.05(C) threshold: school records showing Plaintiff had an I.Q. of approximately 80 on two occasions (Tr. 235);1998 testing revealing an I.Q. of 93 (Tr. 256-71); and 2002 testing showing an I.Q. score of 80 (Tr. 357).

In addition, Dr. Dallara was sufficiently specific in finding Plaintiff functioned at the borderline intellectual level, not the mentally retarded level. (Tr. 402); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003) (The ALJ acknowledged claimant's WAIS I.Q. score of

13

67 but determined she was not mentally retarded because Dr. Berg concluded she functioned at a level exceeding her test score.). Additionally, Dr. Dallara specifically found Plaintiff's cognitive functioning was only mildly impaired concerning work-related limitations. (Tr. 402).

As such, the undersigned believes Plaintiff has not established he meets Listing 12.05(C) because he has not shown a valid I.Q. score between 60 and 70. In any event, Plaintiff still does not meet Listing 12.05(C) because he fails to meet the diagnostic factors – 1) subaverage intellectual functioning; 2) onset before the age of twenty-two; and 3) adaptive-skills limitations. *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir. 2004) ("[T]wo IQ scores of 70, without more, does not satisfy the requirements of Listing 12.05(C).").

Plaintiff argues that numerous instances from his childhood demonstrate subaverage intellectual functioning and deficits in adaptive functioning. (Doc. 16, at 2). He cites his failure to complete grade school (Tr. 37), social problems (Tr. 57), grades (Tr. 231), I.Q. scores (Tr. 240), and disciplinary problems (Tr. 233). Poor academic performance, in and of itself, is not sufficient to warrant a finding of subaverage intellectual functioning before the age of twenty-two. *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009). Important here, none of the psychologists who examined Plaintiff found he functioned at the mentally retarded level, i.e., "significantly subaverage general intellectual functioning." Plaintiff was continually diagnosed with borderline intellectual functioning or low-average intellectual functioning. Dr. Corbitt found Plaintiff was a "slow learn[er]." (Tr. 240); Dr. Russo found Plaintiff had good concentration, intact memory, coherent speech, and average-to-lower-average intelligence (Tr. 275); Dr. Ellis found Plaintiff had average intellectual functioning (Tr. 275); and Dr. Leidal noted Plaintiff's thought content was normal with no evidence of grossly disorganized behavior or marked confusion (Tr.

14

413).

Moreover, the record showed Plaintiff did not have "deficits in adaptive functioning." He was able to obtain a drivers license, test above the qualifying I.Q. level, and maintain employment. The adaptive skills prong also evaluates social skills, communication skills, and daily-living skills. *Hayes*, 357 F. App'x at 677 (*citing Heller v. Doe*, 509 U.S. 312, 329 (1993)). In this regard, Plaintiff was able to prepare simple meals, use public transportation, drive, shop in stores, attend church services, act as an usher during church services, attend AA/NA meetings, and assemble model cars. (Tr. 39-40, 174-75, 194, 211-12, 214-15). Plaintiff also indicated he was very good at fixing things. (Tr. 39, 176, 211).

The foregoing belies any argument Plaintiff was mentally disabled under listing 12.05(C). Accordingly, the ALJ's decision that Plaintiff did not meet listing 12.05(C) is supported by substantial evidence.

### RFC Supported by Substantial Evidence

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 416.929. An ALJ must also consider and weigh medical opinions. *Id.* § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *1.

Plaintiff claims the ALJ erred in formulating her RFC because he cannot meet the demands

15

of even limited sedentary work. (Doc. 14, at 12-14). Specifically, he argues the ALJ should have incorporated limitations providing for extra supervision even when performing a simple job and the need to be unproductive ten-to-twenty percent of the time.

The ALJ accounted for Plaintiff's "severely deficient education" when he limited Plaintiff to simple, routine tasks, with simple short instructions, simple work-related decisions, and few work place changes. (Tr. 16). Further, the ALJ restricted Plaintiff from production rate pace work and work involving math calculations, reading instructions, or writing reports. (Tr. 16).

Plaintiff previously drove a truck, which included hauling scrap metal and operating a back-loader. While Plaintiff could no longer perform the physical aspects of his prior work, there is no indication he was not capable mentally. Indeed, when asked what prevented him from working, Plaintiff said neck and back pain, and made no mention of cognitive problems precluding him from work. (Tr. 45, 154-55). Further, treatment notes indicated Plaintiff had the ability to follow short, simple instructions (Tr. 416) and perform work that was simple and routine in nature (Tr. 421). Even Plaintiff said he could assemble model planes and was very good at fixing things. (Tr. 39, 176, 211).

The ALJ also accurately assessed Plaintiff's physical condition. The record showed Plaintiff had mild degenerative disc disease. (Tr. 393).Dr. Amanambu's examination revealed Plaintiff had no back tenderness, his straight leg testing was negative, and his joints and muscles showed no signs of swelling, tenderness, wasting, or fasciculation. (Tr. 406). Accordingly, the ALJ's RFC finding is supported by substantial evidence.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court

finds the Commissioner's decision denying SSI and DIB benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

                                                 s/James R. Knepp II
                                                United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).